355 So.2d 953 (1977)
FMC CORPORATION
v.
CONTINENTAL GRAIN COMPANY.
No. 7792.
Court of Appeal of Louisiana, Fourth Circuit.
September 8, 1977.
Rehearing Denied October 12, 1977.
*954 Charles Kohlmeyer, Jr., Mack E. Barham, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for Continental Grain Company, defendant-appellant.
*955 John V. Baus, Timothy T. Roniger, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for FMC Corp., plaintiff-appellee.
Before BOUTALL, SCHOTT and BEER, JJ.
BOUTALL, Judge.
This suit arises from a contract in which Link-Belt Company, a division of FMC Corporation, undertook to design, furnish and erect a grain barge unloading facility at the Westwego Grain Elevator of Continental Grain Company. As a result of problems which arose with the operation of the installation, Continental Grain refused to pay the last installment due on the contract, and FMC Corporation entered suit for that amount. Continental Grain defended on the theory that the contract had not been performed as agreed, claimed a setoff, and reconvened for damages for breach of contract. From an adverse judgment, Continental Grain appeals. The issues are whether there was a breach of contract and what is the extent of liability for damages caused the defendant.
We set out some preliminary facts in order to assist in an understanding of the contract in this case. In 1965, Continental Grain Company, one of the largest grain handlers in the world, realized that it was necessary to develop a new system to improve the grain barge unloading facilities it operated in the New Orleans area because the existing system did not appear to be able to meet the growing volume of traffic. It was discovered that FMC Corporation, through Link-Belt Company, had in operation a number of coal barge unloading devices wherein the coal was scooped from a barge with an endless chain of buckets unloading onto a conveyor belt system. After some initial contacts between Continental and FMC, it was arranged to observe an experimental unloading of a barge of corn by one of the FMC unloaders to see if the coal barge system would work when applied to grain. The experiment was successful, and FMC and Continental entered into discussions resulting in an arrangement whereby Continental commissioned FMC for the amount of $41,000 to perform some preliminary concept engineering to determine if the coal barge unloader could be practically applied to Continental's facility in Westwego, Louisiana. The result of this was a contract proposal of September 18, 1967, revised May 22, 1968 after additional engineering studies, and finally accepted July 8, 1968 wherein FMC agreed to furnish and install grain barge unloading equipment designed on certain specifications to remove free flowing grain from barges and deliver it to Continental's belt conveyor system. The price of the contract was in excess of $1,800,000 and the equipment was to be installed and erected as a portion of the entire grain handling facility constructed by Continental at a total cost in excess of $5,000,000.
It is admitted that the grain barge unloader was operating satisfactorily, with one exception, at time of trial. Initially however, the facility encountered a number of problems in its operation, and it is these problems which have caused the defendants to withhold the last payment due under the contract and reconvene for additional damages. There were a number of problems encountered during the construction phase of the project, and there were still a number of small items left to be completed at the time of the acceptance of the project in January, 1971. However, the major basis upon which the defendant relies, and which formed the basis of the reconventional demand, is succinctly set out in the testimony of Max Spencer of Continental Grain:
"There were five breakdowns involved with the unloader; one was the collapse of the entire carriage as a result of the separation of the coupling. The second major instance was the misalignment of the entire gear train and reducer at which time it was discovered that this was a result of negligent field erection. The third one was the failure of the load brake reducer. The fourth failure was the main drive motor rotor and the fifth one was the failure of the main head shaft dividing the bucket elevator." *956 As a result of these breakdowns and failures Continental Grain was forced to use the antiquated system it was replacing and it was stipulated that these damages would amount to $197,000 for actual expenditures for the use of the old system plus the cost of demurrage on barges and ships caused by delay. Additionally, the stipulated sum of $34,000 is claimed for repairs made by Continental Grain in an effort to mitigate damages resulting from the 4th and 5th failures testified to.
The record shows without question that the breakdowns were due solely to the fault of FMC. The collapse of the entire carriage from which the unloader was suspended and the misalignment and excessive wear and tear on the entire gear train were found to be the result of use of excessively long bolts tightening down a set of bearings along the gear train. This defect resulted when it became necessary to eliminate several washers which spaced the bolts such that the bolts now went through the lower portion of the bearing assembly and their tightening had a jacking effect which pushed the shaft up out of line. We consider this to be negligent field erection. The load brake failure was misapplication of a particular load brake system and was corrected by exchanging parts of the braking system for other parts better designed for the application necessary. Similarly, it was necessary to replace the rotor on the main drive motors with other rotors of different types to correct the misapplication to the kind of service and load encountered. The last breakdown, the breaking of the head shaft was due to improper welding by or under the authority of FMC.
FMC Corporation does not seriously dispute that the above items were occasioned by its fault. Instead it contends that the damages sought are not due, because its liability is limited only to replacement of equipment under the contract, that it has made the necessary repairs and furnished the necessary parts called for under its limited warranty specified as follows:
"2:10 Warranty, Liability and Indemnification of Customer:
"A WARRANTY: All Link-Belt equipment is of high quality and is manufactured in conformity with the best commercial practices in the various lines. We guarantee all equipment manufactured by us to be free from defects in material and manufacture at the time of shipment for a period of one (1) year from the date of starting operation of the equipment, provided such start is not delayed by you or for other reasons beyond our control, in which latter events the warranty period shall commence upon the date of completion of installation. We will furnish without charge, but will not install, replacements for such parts as we find to have been defective. Unless otherwise stated in Section 1, this warranty is based on operation of the equipment for a period not exceeding eight hours per day.
"This guarantee shall not apply to any equipment which has been subjected to misuse, neglect or accident, or has been altered or tampered with, or if corrective work has been done thereon without our specific written consent. No allowances will be made for such corrective work done without such consent. Improper lubrication, deterioration by chemical action, and wear caused by the presence of abrasive materials, do not constitute defects. Equipment manufactured by others, and included in our proposal, is not warranted in any way by us but carries only the manufacturer's warranty, if any.
"All warranty claims must be submitted within ten (10) days of discovery of defects or shall be deemed waived. No representative of our company has any authority to waive, alter, vary or add to the terms hereof without prior approval in writing. The foregoing is in lieu of all other warranties (including that of merchantability), whether express or implied.
"B LIABILITY: It is expressly understood that our liability for our products is limited to the furnishing of such replacement parts, and that we will not be liable for any other expense, injury, loss or damage, whether direct or consequential, *957 including but not limited to loss of profits, production, increased cost of operation, or spoilage of material, arising in connection with the sale or use of, or inability to use, our equipment or products for any purpose, except as herein provided."
On this appeal, Continental Grain argues to us that the contract, although couched in the terms of a contract of sale, is actually a contract for construction or a contract "to do". It is pointed out that the Louisiana Civil Code divides conventional obligations into obligations to give and obligations to do or not to do. LCC Articles 1761, 1905 et seq., 1926 et seq. An example of an obligation to give is a sales contract. LCC Articles 2439, 1909. On the other hand, an example of an obligation to do is a building contract. LCC Articles 2745 et seq. It is contended that since this contract is an obligation to do, the statutory warranty pertinent thereto becomes effective, and since a large part of the defects was due to the negligent work of FMC, there can be no contractual removal of liability for such negligent acts.
We do not see the necessity for division of this contract at all or the necessity of classifying it in a particular way. The contract document is a large and involved document concerning a rather complicated project. It required numerous hours of investigation, development, and application of engineering expertise in order to be able to plan for the production of the basic equipment and then install it in order to achieve a certain desired end product or result. In other words, this contract envisaged a proposal between the parties whereby one, with the engineering assistance and approval of the other, would actually develop a piece of machinery, formerly used in coal unloading operations, making it adaptable to grain loading operations and in particular to the necessary requirements for efficient use. Such an immense structure of course cannot simply be purchased over the counter such as an automobile, but is of little value unless it is constructed and integrated into the foundational structures determined by the grain handling company to be advantageous for use of the unloading equipment. One is of little value without the other, the entire project being aimed towards one end result, to-wit: An efficient grain unloader. If we must categorize such a contract, we must basically say, that some parts of it may be a sales contract, where the obligor transfers the ownership of the object (obligation to give) and at the same time install and deliver the object (obligation to do). See 7 S. Litvinoff, La.Civil Law Treatise: Obligations, Book 2, Sec. 157 at P. 287 (1975). But our contract does not involve two obligations which can be separated. It is apparent that the developmental fabrication of the equipment could only be conducted with the expertise of FMC, in consultation with Continental's expert as to necessary application, and then the structure must be integrated into the basic supporting structure and services furnished by Continental to achieve the one desired result. Thus, when the two obligations are inseparable as here, one of the obligations must be determined as fundamental and the rules under that obligation will control. We would therefore categorize the contract as a sale. See Litvinoff, supra, § 158 at P. 291.
Regardless of the categorization of the contract, there is only one agreement that has been entered into by the party and that agreement has the effect of law upon those who form it. LCC Art. 1901. The provisions of the contract provide for a different warranty than the general law and different liability provisions for damages. It is the further contention of Continental Grain that there is ambiguity in the wording of the contract and that the contractual agreement applies only to the hardware or machinery, and not to the construction phase of the contract or the obligation to do. In answer to this contention we refer to the written reasons of the trial judge who expressed the problem succinctly as follows:
"Argument is made by counsel for Continental Grain that such warranty and liability provisions were inapplicable to *958 the construction phase of the work and should be limited only to the contract of sale of certain shelf items used in the construction of the unloader. Such limited interpretations apparently resulted from the following language in the first paragraph of the warranty provision"
`"We guarantee all equipment manufactured by us to be free from defects in material and manufacture at the time of shipment for a period of one year"' (emphasis added.)
"However, under LSA C.C. articles 1945, 1946, 1950, 1951 and 1952, this Court, when considering the entire sentence, determines the true intent of the parties to allow a one year guarantee from the `. . . starting date of operation of the equipment . . .' or `. . . date of completion of installation. . .' if the former was delayed. This reference to completion of installation clearly indicates construction of the unloader was included in the contract. A reference to an additional charge for erection labor and supervision within the same contract supports such a view.
"Without authority presented for defense counsel's argument that such warranty and liability provisions are improper in a construction contract as compared to a contract of sale, this Court feels they are proper under LSA article 11, 1764, and 1901 if the seller has borne the burden of establishing that the limitation of warranty was (1) express and unequivocal under LSA C.C. 2474; (2) resulted from mutual consent or meeting of the minds; (3) made in good faith by the seller; and (4) is consistent with public policy under LSA C.C. article 1964(2).
"After a review of the provisions, this Court has determined that the language was sufficiently express and unequivocal; that considering the fact that the contract was submitted to the legal department of Continental Grain and was in a prominent location in the contract, mutual consent to such provisions can be presumed to have existed; and that the limitations were made in good faith, considering the size and uniqueness of the undertaking.
"Finally, it is not in contravention of public policy for Link Belt to limit its liability by such provisions. Freeman v. Department of Highways, 253 La. 105, 217 So.2d 166 (1968)."
As additional support to this latter proposition, we would refer to the cases of Estein v. Wolff, 14 So.2d 789 (La.App. 2d Cir. 1943) and Abis, Inc. v. Burns Electronic Security Services, Inc., 283 So.2d 822 (La.App. 2d Cir. 1973). We also refer to the case of Anderson v. Bohn Ford, Inc., 291 So.2d 786 (La.App. 4th Cir. 1973); Cert. Denied, 294 So.2d 829 (La.1974) wherein a distinction was made in the rules applying to waiver of warranties between consumer and dealer and as between dealer and manufacturer.
Adopting the findings and reasoning of trial judge, which are amply supported by the record, we hold that the liability of FMC is controlled by the contractual limitation of furnishing replacement of the equipment only, and relieving any liability for any other expense, loss or damages, either direct or consequential, arising out of the loss or inability to use the equipment. All of the labor and equipment necessary to correct the major defects due to the misalignment and to place the machinery into operation were furnished by FMC. The major claim here is for damages other than repair or replacement. The stipulated claims totaling $197,000 for extra costs were due to necessity to renovate and continue operation of the inefficient marine leg unloaders previously used. They come within the exclusion from liability, and cannot be assessed against plaintiff.
Similarly, the second element of damages of $34,000 for repairs made in an effort to mitigate damage are covered by the exclusion, with the exception of an item for $3,400 for replacing the rotor on the Westinghouse drive motors with a different type rotor, better suited to the job requirements. We would deny the claims arising from the breaking of the head shaft due to improper welds as occurring beyond the warranty *959 period of one year from the date of starting operation of the equipment.
The last issue with which we are concerned is the claim of Continental Grain that the specifications of the contract have been breached in that the contract seems to provide for the equipment to be lowered and raised at a much higher speed than can actually be done. This slowdown in speed increases the operation time of the equipment, and accordingly, costs extra labor expenses during these delays. It is contended that this increased time-labor loss over the minimum 10 year life span of the facility amounts to $227,000. We again adopt the opinion of the trial judge, this being a matter of interpretation of the contract and a consideration of all of the facts connected therewith.
The second issue for consideration involved the alleged claim for reduction in the lowering speed of the unloader.
It was testified to by most of Continental Grain's witnesses, including Max Spencer, that such reduction was the only modification in the performance criteria established for the machine and that it is still a substantial advancement in the art of grain unloading. It was further submitted that the free digging capacity of 68,000 bushels per hour has been met. Max Spencer further testified that the unloader gave Continental Grain a competitive edge, being more rugged, and requiring less manpower than the marine legs. The Court notes that the unloader has doubled the number of barges that can be unloaded daily at the facility.
Max Spencer also testified that demurrage per barge was also a consideration; that the reduced lowering speed costs Continental Grain about 21 minutes in a 12 barge day; and that the unloader has only been able to once unload the contracted for 18 barges per 24 hour continuous operating day while the average is 13 or 14 barges per day.
The significant contract language states:
"On the basis of the above calculated unloading time cycles, and assuming an even mix of the rake-end and box-end type barges with an overall average capacity of 45,000 bushels, it is anticipated this barge unloader will have capacity for unloading 18 barges per 24-hour continuous operating day. It is to be recognized that this unloading rate is predicated upon efficient application by the operator to insure maximum elevator bucket loading at all times, as well as the availability of uncovered, loaded barges for continuous utilization of the unloader from a cover handling station." (emphasis added)
Note that this "anticipated" capacity is based on such factors as type of barge, whether rake-end or box-end, capacity of each barge, the number of passes within each barge that will be required, efficient operation of the unloader, and availability of barges.
Again, according to Max Spencer, the number of barges handled is also affected by numerous other variables, all outside Link-Belt's control and occasionally fortuitous to both parties. These include the type of grain (corn, wheat, soybeans), amount of space available in the elevator, the functioning of the conveyor system, weather conditions, and river stage.
Another factor the Court notes is that the contract specified ". . . unloading 18 barges per 24 hour continuous operation day." Within this period however are two lunch breaks, each one hour in duration. Accepting fifty-five minutes as the best time for completion of one entire unloading cycle as mentioned by Max Spencer, it is submitted that 18 barges could still be unloaded within this 22 hour continuous operating day, without considering the other variables.
Counsel for plaintiff asserts that notice of the reduction in lowering speed was also provided Continental Grain prior to its formal acceptance as can be seen by a diagram exhibit clearly indicating the new speed and bearing Continental Grain's stamp and dated May 11, 1970.
"The significance of such notice is not clear in the Court's mind however, as *960 both parties appeared to ignore such speed limitation during the first few months of the unloader's use. Only after the Whiting load brake, the mechanism that allows the unloader to be lowered into the barges, developed a problem after June 16, 1971, was a restriction in speed imposed. In October 1971, pressed asbestos pads were used in place of bronze pads and all restrictions were removed except those on the lowering speed.
"Considering the various factors affecting the number of barges unloaded, aside from the reduced speed, and the recognized fact that the contracted for bushels per hour capacity can be met, this Court must conclude that any setoff for this reduced speed as affecting the number of barges unloaded would be improper as too speculative." (References to pages of testimony omitted.)
We are of the opinion that the evidence amply supports the findings and conclusions of the trial judge, and we find no manifest error in them. Accordingly, we affirm the judgment appealed.
AFFIRMED.
SCHOTT, Judge, dissenting in part:
I am unable to agree with my colleagues in their conclusion that they would categorize the contract between these parties as a sale. This project was a massive building contract, and while it included the installation of both custom made items as well as shelf items it was no less a building contract than would be the construction of an office building on one's property.
It is clear from the jurisprudence that it is not contrary to the public policy of Louisiana to include an exculpatory clause in a building contract. Freeman v. Department of Highways, 253 La. 105, 217 So.2d 166. However, in order for an exculpatory clause to be effective it must surely be clear and unambiguous. Anderson v. Bohn Ford, Inc., 291 So.2d 786 (La.App. 4th Cir. 1973), writ refused, 294 So.2d 829 (1974). It is in this respect that I believe the exculpatory clause to be ineffective for the purpose of protecting plaintiff against liability to defendant for the damages it suffered in connection with the first and second breakdowns mentioned in the testimony of Max Spencer and quoted in the majority opinion.
Shortly after this facility was put into operation the massive bridge on which the digging apparatus was suspended fell, and upon investigation the parties learned that the gears had worn unevenly indicating that the entire structure was out of line. The whole problem was caused by the failure to insert washers under the bolts holding the bearings in place. Here is the testimony of plaintiff's construction superintendent on the point:
"Q. Is it not a fact that you are tightening up on the bolts afterwithout using the washers, have the effect of a jack screw on the bearing and raised it up and caused a misalignment?
A. Absolutely. This was an oversight and if we had known this was happening we certainly would have corrected but we just didn't know it.
Q. Now insofar as the jacking action was concerned that had the effect of causing a misalignment of your gear train, didn't it?
A. Yes, it gave all of us a great deal of concern in trying to find out what was happening."
As pointed out by defendant's counsel in his brief, one is reminded of the story of the loss of the kingdom for the want of a nail when we consider that all of this trouble stemmed from what appears to be such a small item, and at the same time an elementary error in the construction.
For this item it was stipulated by the parties that defendant expended the sum of $197,000 in order to reactivate the old marine legs and for demurrage on railcars and vessels resulting from the shutdown of the new facility and the required use of the old marine legs.
In the contract between plaintiff and defendant there are provisions concerning erection of the facility. The problem we *961 are concerned with here was negligent erection. The question is whether the exculpatory clause is clear enough to include erection in its limitation of liability with respect to replacement of parts, as follows:
"It is expressly understood that our liability for our products is limited to the furnishing of such replacement parts, and we will not be liable for any other expense, injury, loss or damage, whether direct or consequential, including but not limited to loss of profits, production, increased cost of operation, or spoilage of material, arising in connection with the sale or use of, or inability to use, our equipment or products for any purpose, except as herein provided."
I cannot interpret this limitation to cover the deficiency we are here considering for a number of reasons:
1. The overall purpose of this clause was to protect plaintiff against liability for the type of defects both parties had to anticipate might arise out of the design and construction of such a massive facility. It is all too obvious that where plaintiff undertook to design such a complex facility and both parties realized that thousands of engineering hours would be necessary, plaintiff could not guarantee and defendant could not expect perfect performance. This is one reason why I find no difficulty in rejecting defendant's claim for damages arising out of the reduction of the vertical speed of the elevator. But by this clause I cannot believe that the parties intended to insulate plaintiff from liability for lack of care which one would expect from a reasonably prudent mechanic. It should have been obvious to anyone of plaintiff's mechanics who were tightening these bolts that the heads of the bolts were going through the lower portion of the bearing and it was obvious that a washer was needed. Even a jackleg mechanic would recognize this to be so, and this kind of a deficiency is so elementary that it is unrelated to engineering decisions made on the project.
In effect, I am saying that neither of these parties intended for this clause on limitation of liability to insulate plaintiff from the kind of simple mechanical negligence which caused this breakdown, but rather they intended to protect plaintiff from deficiencies which might come about as a result of errors in engineering judgment considering the complexity of the structure and the design problems which were involved.
2. In other parts of this contract the word "erection" is used. For instance, in Section 1.04 there are provisions for additional prices for erection, and in Section 2.05 there is the provision entitled "Erection" which reads "We will maintain during erection a competent foreman or superintendent who, in the selection and handling of his crew, will observe your interests and those of your subcontractors . . .."
The exculpatory clause speaks of the limitation of liability for plaintiff's "products," limiting the liability to the furnishing of replacement parts. The paragraph expressing the warranty speaks of plaintiff's equipment being of high quality and manufactured in conformity with the best commercial practices. There is a guaranty for equipment manufactured by plaintiff to be free from defects.
I cannot equate the words equipment, manufactured equipment and products with the word erection. When this apparatus was bolted together it was not being manufactured in the sense that we normally understand the manufacture of appliances or automobiles. Furthermore, there are no parts to be replaced in a defective erection. The defect here involves the replacement of no parts at all, it involves the use of a washer where such use was an obvious necessity to prevent the head of a bolt from being screwed into a piece of metal.
3. Finally, the contract itself, and particularly the provision setting forth the warranty and the exculpatory clause were drawn on a form provided by plaintiff with the result that any ambiguity or lack of clarity is to be construed against it. In this connection I am not impressed by the fact that these were two large sophisticated corporations with legal and engineering staffs capable *962 of protecting their interests. This case was tried on the basis of the written contract with no parol evidence introduced to explain what these parties intended by the adoption of this warranty clause. The law is clear whether the parties be simple individuals or giant corporations, an ambiguity in a contract will be construed against the party who prepared it, and in my view it is inconceivable that this clause has the effect which is advocated by plaintiff in this case with respect to the initial failure of this system due to plaintiff's negligent erection.
For these reasons, I would reverse the judgment of the trial court to the extent of awarding to defendant the sum of $197,000 on its reconventional demand. In all other respects I agree with my colleagues that the judgment should be affirmed.

ON APPLICATION FOR REHEARING
BEER, Judge.
The basic issue, as I see it, is not whether the failure was "FMC's fault" but whether FMC's overall handling of the matter was so substandard or, to quote myself, so "horrendous" as to obviate the applicability of the clauses limiting liability.
The dissenting judge concludes that "any jackleg mechanic" would have known better than to proceed as FMC did in the circumstances. He finds the cause of the breakdown as "something so elementary that it seems incredible that it could have produced such horrendous results" and is of the opinion that "it should have been obvious to any one of (FMC's) mechanics who were tightening these bolts that the heads of the bolts were going through the lower portion of the bearing and it was obvious that a washer was needed." With all respect, I can not find, in the record, either lay or expert testimony or any other evidence to support these conclusions.
Were I to agree with these conclusions, I would certainly vote to grant a rehearing. But my review of the record demonstrates no basis upon which I can conclude that FMC was grossly negligent or that any jackleg mechanic would have discovered and, having discovered, would have obviated the problem which led to the failure of the device. The testimony which is quoted and relied upon by the dissenting judge and which apparently forms the basis for his conclusions certainly does prove that the oversight was, indeed, the cause of the failure, but I cannot judicially translate an acknowledged oversight into "the grossest kind of negligence" as referred to in appellant's excellent brief in support of their application for rehearing. There may very well be experts who would have, in the best of good faith, given categoric testimony to the effect that the "oversight" was, in fact, clear indication of "the grossest kind of negligence." Such could very well be the case. But I do not find that to be a conclusion supported by this record, nor am I able, in considering this appeal, to reach that independent conclusion. I am unable to bridge that gap because I find no affirmative proof of samea requirement which I consider to be an absolutely basic ingredient in reaching such a conclusion.
Perhaps evidence could still be adduced which would be supportive of a finding of gross negligence and which would, accordingly, also support a trial judge's conclusion to the same effect. But it is not in this record at this time and even the most articulate contentions that it should be assumed to exist cannot, in my view, make up for the fact that it is absent. Accordingly, I see no useful purpose to be served in granting a rehearing since the present record is the instrument with which we must deal. Furthermore, at least in my view, the record does not support a determination that appellant should be entitled to a further opportunity to try again to prove that the admitted oversight which caused the jacking action which, in turn, caused the misalignment of the gear train was "the grossest kind of negligence." Since I find no support in the record for any conclusion beyond the straightforward acknowledgement of the oversight and the attendant result therefrom, I vote to deny the application for rehearing.