## GULF STATES UTILITIES CO.

v.

## IMO DELAVAL, INC.

### Civ. A. No. 90–1002.

United States District Court, M.D. Louisiana.

July 30, 1992.

Frederick R. Tulley and C. Michael Hart, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for plaintiff.

Curtis Boisfontaine and Sally Shushan, Sessions & Fishman, New Orleans, La., for defendant.

## MEMORANDUM AND ORDER

SEAR, Chief Judge.

On October 17, 1990, Gulf States Utilities Company ("GSU") filed this action against IMO Industries, Inc. ("IMO")[1] for breach of contract, invoking this Court's diversity jurisdiction. In this contract, IMO agreed to provide GSU with two standby emergency diesel generator systems ("standby generator systems"). IMO moves for summary judgment on grounds that plaintiff filed its claim after the applicable prescriptive period had expired.

*Facts*

GSU owns and operates a nuclear power generating plant, which is subject to the regulations of the Nuclear Regulatory Commission ("NRC").[2] A nuclear power plant must have a safety system designed to shut down the plant in the event of an accident. A nuclear power generating plant must have an emergency power supply to cool the reactor, and operate other necessary devices, during such a shut down. To satisfy this need, nuclear power plants have standby generator systems, typically powered by diesel engines. Such systems must be capable of starting on demand and reliable during operation to prevent a nuclear accident. Because of their essential role in a nuclear plant's safety, standby generator systems must meet extensive, detailed specifications.[3]

The two basic components of a standby generator system are the diesel engine and the generator. The generator converts the diesel engine shaft power into electrical power.[4]

In designing its plant in 1974, GSU asked IMO to submit a proposal to furnish two standby diesel generator systems in accor-

---

1. IMO was formerly named IMO Delaval, Inc. and Transamerica Delaval, Inc.

2. GSU's statement of material facts no. 1 and IMO's answer, admitting same.

3. These background facts are included to assist in understanding the contract and claim asserted in this case.

4. IMO's uncontested facts no. 5; GSU answer.

dance with Specification No. 244.700, prepared by GSU and setting forth the required design specifications for the standby generator system.[5] IMO submitted a proposal.[6] GSU accepted IMO's proposal by means of a purchase order, which incorporated by reference the provisions in the Specification.[7] The parties later made several modifications to this contract.[8] These documents evidence the contract between the parties.

IMO previously had provided three similar standby diesel generator systems to the Long Island Lighting Company for use at their Shoreham Nuclear Power Station ("Shoreham"). In August 1983, during testing, the crankshaft in one of the diesel engines failed. Thereafter, the NRC notified all utilities that owned IMO standby generator systems of the Shoreham crankshaft failure. In response, utilities with IMO standby generator systems formed an Owner's Group, to examine the design of the system and make the necessary modifications to satisfy the NRC. GSU alleges that it had to review the design of the system and engage in a quality revalidation process. Ultimately, GSU allegedly modified its system and de-rated the engines from 3500 kw, as called for in its Specifications, to 3130 kw. At this lower capacity, GSU obtained the necessary license from the NRC and commenced commercial operation on June 16, 1986.[9] GSU seeks to recover the costs incurred in reviewing the design of the system and in the quality revalidation process, the costs incurred to modify the system to obtain approval from NRC, and for loss of standby power capacity. GSU seeks $8 million.[10]

*Analysis*

### I. *Contract of Sale v. Contract to Build*

 IMO moves for summary judgment dismissing GSU's claim as prescribed. IMO contends that, under Louisiana law, the contract is one for the sale of a thing, subject to a one year prescriptive period and that this period expired prior to the filing of this suit.[11] GSU opposes, contending that the contract is one to build, subject to a ten year prescriptive period.[12]

The Louisiana Civil Code divides conventional obligations into obligations to give (i.e., a sale) and obligations to do (i.e., a contract to build). Further, the Code defines each:

> The contract of sale is an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.[13]

> To build a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price. A person who undertakes to make a work, may agree, either to furnish his work and industry alone, or to furnish also the materials necessary for such work.[14]

To support its contention that the contract is one to build, GSU emphasizes that IMO was to "design and manufacture" the equipment to these specifications.[15] GSU, however, misconstrues the contract.

In the contract, IMO agreed to furnish various types of equipment that met certain, detailed specifications.[16] Rather than designing or manufacturing this equipment from raw materials, IMO agreed to furnish

---

**5.** IMO's exhibit no. 1 is the request from GSU. GSU's exhibit "A" is Specification No. 244.700.

**6.** IMO's exhibit no. 3.

**7.** IMO's exhibit no. 4.

**8.** *See* IMO uncontested fact no. 6 and GSU's answer; GSU's exhibit "C," "D," and IMO exhibit no. 5.

**9.** IMO's uncontested facts nos. 13–18, 22; GSU's answer nos. 13–18, 22.

**10.** Complaint ¶¶ 19–21.

**11.** La.Civ.Code art. 2534.

**12.** *Id.* art. 3499.

**13.** *Id.* art. 2439.

**14.** *Id.* arts. 2756–2757.

**15.** Affidavit of GSU representative John Hamilton ¶ 5.

**16.** GSU Exhibit A, the Specification.

pre-fabricated equipment, purchased from other vendors.[17]

Significantly, with regard to the diesel engines, the only equipment of which GSU complains, IMO offered its commercial-grade R–48 diesel engines from its stock.[18] Indeed, IMO attached to its proposal a brochure describing its various engine models, including the "R–series."[19] GSU accepted IMO's offer and IMO supplied to GSU two R–48 engines, part of its standard "R-series."[20] Accordingly, IMO did not create, design or manufacture the engines supplied specially for GSU. Rather, it sold GSU engines "off the shelf."

Finally, the contract provides for GSU, not IMO, to install or erect the system.[21] Thus, the contract terms, and the affidavits of the GSU and IMO representatives,[22] show that the contract is a contract of sale. Notably, the contract itself consistently refers to the parties as "Seller" and "Purchaser."[23]

Although the contract required GSU to install the equipment, IMO offered to furnish the services of an engineer, at the request of GSU, to assist in erecting the system[24] and IMO engineers did provide such assistance.[25] Nonetheless, that IMO provided its services does not convert the contract from one of sale to a contract to build.

Where a contract contains both obligations to give (i.e., sell) and obligations to do (i.e., provide services), "the contract as a whole may be characterized by its predominate or fundamental obligation."[26] "Thus, the mere fact that an obligor may be involved in the installation of the equipment sold will not change the characterization of the obligation from that of a sales contract and therefore the rules governing a sale will control."[27]

IMO's participation in the installation of the system consisted of making some of the necessary repairs and modifications to obtain NRC approval, and supervising the repairs and modifications performed by GSU personnel or engineers hired by GSU.[28] IMO rendered this assistance at the request of GSU and GSU maintained control of the installation throughout. Louisiana courts have characterized as sales, contracts where the sellers rendered even greater assistance than IMO in installing the purchased equipment.[29] Thus, the extent of IMO's involvement in the installation process does not change the predominate obligation of the contract from an obligation to give into an obligation to do.

17. IMO uncontested fact no. 4, GSU denies this fact but offers no evidence to the contrary. Indeed, the contract documents support this contention, *see* IMO proposal, IMO exhibit no. 3, p. 1017296, ¶ 13 ("The equipment contemplated to be furnished hereunder, *other than those items normally purchased from others,* may be manufactured ...") (emphasis added); Affidavit of Alan Barich ¶ 2; GSU Purchase Order, IMO exhibit no. 4, p. 2 (suggesting same). None of the evidence supplied addresses whether IMO in fact designed or manufactured any equipment or purchased such equipment from other vendors.

18. IMO exhibit no. 3.

19. *Id.*

20. IMO uncontested fact no. 5; GSU answer; IMO exhibit no. 2, ¶ 4 (affidavit of Alan Barich).

21. Affidavit of GSU representative John Hamilton ¶ 5; GSU Purchase Order, IMO exhibit no. 4, p. 4.

22. GSU Affidavit of John Hamilton; IMO Affidavit of Alan Barich.

23. GSU exhibit A (the Specifications).

24. GSU Purchase Order, IMO exhibit no. 4, p. 5; GSU Affidavit of John Hamilton ¶ 5.

25. GSU Exhibit D; GSU Affidavit of John Hamilton ¶ 10.

26. *Austin's of Monroe, Inc. v. Brown,* 474 So.2d 1383, 1387 (La.App.2d Cir.1985); *see also Calandro's Supermarket, Inc. v. Hussman Refrigeration, Inc.,* 525 So.2d 316, 319 (La.App. 1st Cir. 1988).

27. *Calandro's Supermarket,* 525 So.2d at 319; *see also Tidewater, Inc. v. Baldwin–Lima Hamilton Corp.,* 410 So.2d 355, 357 (4th Cir.1982); *FMC Corp. v. Continental Grain Co.,* 355 So.2d 953, 957 (La.App. 4th Cir.1977).

28. GSU Affidavit of John Hamilton, ¶ 22.

29. *See Calandro's Supermarket,* 525 So.2d at 318–19; *FMC Corp.,* 355 So.2d at 955–57 (finding a contract to be a sale where seller designed and installed equipment).

Accordingly, the contract entered between GSU and IMO is a contract of sale and governed by those legal rules applicable to sales.

## II. *Redhibition*

■ Under Louisiana sales law, if the thing sold contains a vice or defect, the buyer has a claim in redhibition.[30] A redhibitory action must be commenced within one year from the date of the sale.[31] If however the seller knew of the vice or defect and failed to declare it to the buyer, the buyer may commence the action at any time, provided one year has not elapsed since the discovery of the vice.[32] A manufacturer of a product is presumed to know the vices of its product.[33] Because IMO manufactured the product claimed to be defective, the diesel engines, GSU must commence any claim for redhibitory defects within one year from its discovery of the defect.

GSU complains of defects in the standby generator system and of the loss of power capacity. The standby generator systems were placed in commercial operation at their de-rated capacity on June 16, 1986.[34] At this point in time, GSU clearly was fully aware of the defects and of the loss of power capacity because it had remedied the defects and had obtained its license from the NRC on the condition that it de-rate the capacity of the system. Thus, at the very latest, the prescriptive period for GSU's claim commenced on June 16, 1986. GSU did not file its suit against IMO until Octo-

ber 17, 1990, well after the prescriptive period had expired.

## III. *GSU's "Contractual" Claims*

■ To avoid this result, GSU argues that its claim does not lie in redhibition, rather it claims IMO breached the contract. For example, GSU claims that IMO breached its express contractual warranties. In the contract, IMO warranted that the equipment would be free from defects in design, workmanship and material and would be suited for its intended purpose. IMO also warranted that the equipment would perform in accordance with the specifications.[35] GSU's breach of warranty claim however is likewise subject to the one year prescriptive period.

The general rule is that, under Louisiana law, damages caused by a breach of warranty in a sales contract are regarded as founded upon redhibition and subject to the rules and limitations in redhibition.[36] Nonetheless, when the product is not truly "defective," courts have applied the law of general obligations to breach of warranty claims in sales contracts.[37] Those courts reason that the buyer complains not of a defect, but rather that the seller provided the wrong product.

For instance, *Peoples Water Service Co. v. Menge Pump and Machinery Co., Inc.*,[38] on which GSU relies, provides a factually analogous situation. Aware that its well water was more acidic than average and had other non-standard characteristics such that a "stock" pump would not do, plaintiff had detailed specifications pre-

---

**30.** La.Civ.Code art. 2520.

**31.** *Id.* art. 2534.

**32.** *Id.* art. 2546.

**33.** *E.g., Melancon v. Continental Oil Co.*, 420 So.2d 1251, 1253 (La.App.3d Cir.1982).

**34.** IMO uncontested fact no. 22, GSU answer.

**35.** IMO uncontested fact no. 7, GSU answer; IMO exhibit no. 6 (excerpt of the Specification) and no. 7 (GSU's answer to interrogatory no. 24).

**36.** *PPG Indus., Inc. v. Industrial Laminates Corp.*, 664 F.2d 1332, 1335 n. 5 (5th Cir.1982); *Austin v. North American Forest*, 656 F.2d 1076,

1083 (5th Cir.1981); *Melancon v. Continental Oil Co.*, 420 So.2d 1251, 1253 (La.App.3d Cir.1982); *Molbert Bros. Poultry & Egg Co. v. Montgomery*, 261 So.2d 311, 314 (La.App.3d Cir.), *writ denied*, 263 So.2d 46 (La.1972).

**37.** *See Seafoam, Inc. v. Barrier Systems, Inc.*, 830 F.2d 62 (5th Cir.1987); *Delta Refrigeration Co. v. Upjohn Co.*, 432 F.Supp. 124 (W.D.La. 1977), *aff'd*, 575 F.2d 879 (5th Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 574, 58 L.Ed.2d 655 (1978); *Harkins v. Howard Lumber Co., Inc.*, 460 So.2d 772 (La.App.3d Cir.1984)

**38.** 452 So.2d 752 (La.App. 5th Cir.), *writ denied*, 456 So.2d 1391 (La.1984).

pared for the design of the desired water pumps. Defendant submitted a bid responsive to plaintiff's specifications. Defendant, however, furnished plaintiff a "showroom floor" standard pump. When the pumps failed five years later, plaintiff learned that the pumps did not meet its specifications. The court held that plaintiff's claim did not lie in redhibition because plaintiff did not complain of a defect. Rather, the court found that defendant failed to provide the specific type of pump contracted for.

This action resembles *Peoples* in that, in both, the buyer prepared detailed specifications for the product it desired and the sellers offered to furnish a product with those specifications. Further, in both, the seller ultimately furnished an "off the shelf" product. In *Peoples*, however, the seller's proposal made "[n]o mention of a specific standard pump model or pump manufacturer."[39] Here, in its proposal, IMO informed GSU that it would provide its "stock" engine and even attached a brochure describing this engine. GSU accepted this proposal and indeed received this "stock" engine. Thus, GSU received the product it contracted for.

Moreover, GSU's claim arises from a "defect," not from a failure to provide the product contracted for. GSU has identified numerous defects in the engine's crankshaft.[40] GSU further complains that it incurred significant costs in reviewing and testing the IMO standby generator system. This review and testing became necessary when the IMO standby generator system at Shoreham "broke" during testing. When a product breaks, it suggests that the product may be defective. GSU had to review and test its IMO standby generator system to determine necessary modifications and

repairs, and then perform those repairs, so that its engines would not be defective like those at Shoreham. Thus, despite its assertions to the contrary, GSU's claims stem from the defects in the standby generator system, not from IMO's failure to supply the product contracted for.

GSU contends that the United States Fifth Circuit's decision in *Seafoam, Inc. v. Barrier Systems, Inc.*,[41] wherein the court applied a ten year prescriptive period to a buyer's breach of warranty claim, applies to its action. That case however differs. The Fifth Circuit expressly found that the product did not contain a defect, whereas here, GSU does claim that the product is defective. Accordingly, the decision in *Seafoam* is not controlling.

Those claims for breach of warranty found to lie in redhibition include claims for breach of a warranty that the equipment or materials furnished would comply with federal regulations and specifications,[42] or a warranty that the thing sold would be fit for the intended use[43] or free from defects.[44] Similarly, GSU's claim that IMO breached its warranty that the equipment would be free from defects and would conform to the specifications of the contract, lies in redhibition. As such, GSU's claim has prescribed.

GSU further attempts to state a claim for breach of contract on grounds that IMO breached the affirmative obligations it assumed in the contract. For support, GSU attempts to characterize IMO's obligations as obligations to do. In determining whether the contract is one for sale or one to build, the obligations assumed by IMO in the contract must be examined. In so doing, I find that IMO obligated itself to give (i.e., sell), not to do.[45]

**39.** *Peoples,* 452 So.2d at 753.

**40.** *See* GSU response to interrogatory no. 22, IMO exhibit no. 6.

**41.** 830 F.2d 62 (5th Cir.1987) (summary calendar). *See also PPG Indus., Inc. v. Industrial Laminates Corp.,* 664 F.2d 1332, 1335 n. 5 (5th Cir.1982) (suggesting that *Delta Refrigeration Co. v. Upjohn Co.,* 575 F.2d 879 (5th Cir.1978),

on which *Seafoam* heavily relies, may have misapplied Louisiana law).

**42.** *Austin v. North American Forest,* 656 F.2d 1076, 1079 (5th Cir.1981).

**43.** *PPG Indus.,* 664 F.2d at 1334.

**44.** *Melancon v. Continental Oil Co.,* 420 So.2d 1251, 1253 (La.App.3d Cir.1982).

**45.** *See supra* p. 3–7.

In particular, GSU strenuously contends IMO breached its obligation to pay for the cost of remedying the defects. In warranting the condition of the equipment, IMO agreed to pay "the cost of removal and reinstallation of any defective work."[46] This provision lies in the stipulated remedies available to GSU if IMO breached its warranty that the equipment would be free from defects. Because GSU's claim for breach of this warranty has prescribed, GSU cannot obtain this relief. Moreover, GSU cannot enforce this provision because it failed to satisfy the conditions set forth in the contract for enforcing this provision. For GSU to obtain this remedy, the contract required it to give IMO *written* notice of any defect and GSU failed to do so.[47] GSU does not dispute that it never gave IMO written notice of any defect, instead, GSU emphasizes that IMO was fully aware of the defects. The contract unambiguously required GSU to give *written* notice; IMO's knowledge is irrelevant. Thus, GSU failed to satisfy the contractual condition necessary to enforce this provision.

## IV. *Redhibition does Apply*

Finally, GSU unartfully argues that its claim does not lie in redhibition. GSU apparently implies that, if its claim does not lie in redhibition, the foregoing analysis and law cannot apply. GSU erroneously argues that its claim does not lie in redhibition because the law of redhibition does not encompass the allegations it makes and does not provide the relief it seeks.

### 1. GSU's claim

GSU has identified numerous defects in the crankshaft of the engine.[48] A claim that the thing sold contains a defect clearly lies in redhibition.[49] GSU further claims that the standby generator system provided by IMO did not meet the required specifications. This claim likewise lies in redhibition.

GSU asked IMO submit a proposal to furnish two standby diesel generator systems in accordance with Specification No. 244.700, which set forth the required design specifications. By submitting such a proposal, IMO "represented" that it could provide a standby generator system that satisfied the specifications. In other words, IMO "represented" that its system would possess a certain quality, that is, that it would perform in satisfaction of the specifications. GSU claims that the system sold does not possess this quality. A representation by a seller that the thing sold has some quality that the thing in fact does not have gives rise to a claim in redhibition.[50] Thus, GSU's claims do lie in redhibition.

### 2. The relief GSU seeks

GSU alleges that, because the standby generator system did not satisfy the specifications, it had to engage in a design review and quality revalidation process and had to repair and modify the system. GSU seeks to recover the costs incurred in its review and testing of the system, and the cost to repair the system so that it satisfied the specifications. Again, as the manufacturer of the thing sold, IMO is presumed to know its defects, the defect being that the system did not satisfy the specifications. A seller who knows of the defect and omits to declare it owes, among other things, repayment of expenses and damages.[51] Such damages or expenses include the cost incurred in remedying the defect.[52]

Further, GSU represents that the system is now operable, but only at a reduced capacity. GSU also seeks to recover for the loss of standby power capacity. GSU claims that the standby generator system,

---

**46.** GSU exhibit A (the Specifications) p. 1–87.

**47.** *Id.*

**48.** *See* GSU response to interrogatory no. 22, IMO exhibit no. 6.

**49.** La.Civ.Code art. 2520.

**50.** *Reiners v. Stran–Steel Corp.,* 317 So.2d 657, 660 (La.App.3d Cir.), *writ denied,* 320 So.2d 914 (La.1975). *Cf.* La.Civ.Code art. 2529.

**51.** La.Civ.Code art. 2545.

**52.** *See, e.g., Monk v. Oakdale Motors, Inc.,* 544 So.2d 98, 100 (La.App.3d Cir.1989).

after repair, still did not satisfy the specifications. Specifically, the specification demanded a diesel engine that could operate at 3500 kw. After modification, GSU contends the system can operate safely at only 3130 kw. In submitting its proposal, IMO "represented" that it could provide an engine that would operate that at 3500 kw. GSU thus claims that the system does not perform as IMO represented it would. To claim that the system does not perform as represented, states a claim that the system is of lesser quality.[53] Despite this power limitation, GSU chose to keep the standby generator system.[54] When the quality of the thing sold is not as the seller represented but the buyer is content with accepting lesser quality, the buyer may obtain a reduction in price.[55]

■ Thus, the law of redhibition provides all the relief GSU seeks. Under the law of redhibition, GSU can recover the cost incurred in modifying the system so that it satisfied the specifications, and GSU can obtain a reduction in the purchase price for the loss of power capacity. A claim for reduction in purchase price is governed by the same rules and the same limitations as a redhibitory action.[56] Accordingly, GSU's argument that its claim does not lie in redhibition and thus is not subject to the one year prescriptive period fails.

Because GSU filed its claim against IMO after the applicable prescriptive period had expired,

IT IS ORDERED that IMO's motion for summary judgment is GRANTED.

---

**53.** *See Austin v. North American Forest,* 656 F.2d 1076, 1083 (5th Cir.1981) (thing sold did not satisfy specifications, court considered "defect" to be lesser quality than represented). *See also Freiler v. Reliable Soil Co.,* 224 So.2d 177 (La. App. 4th Cir.1969) (characterizing a "defect" that the thing sold could not perform as represented as affecting the "quality").

**54.** GSU affidavit of John Hamilton ¶ 20.

