261 So.2d 311 (1972)
MOLBERT BROTHERS POULTRY & EGG COMPANY, Inc., et al., Plaintiffs-Appellants-Appellees,
v.
Edgar W. MONTGOMERY, Defendant-Appellee-Appellant.
No. 3788.
Court of Appeal of Louisiana. Third Circuit.
April 19, 1972.
Rehearings Denied May 16, 1972.
Writ Refused June 20, 1972.
*312 McHale & Bufkin by Louis D. Bufkin, James L. Babin, Lake Charles, for plaintiffs-appellants.
Cormie & Morgan by Robert E. Morgan, Lake Charles, for defendant-appellee.
Before SAVOY, MILLER and DOMENGEAUX, JJ.
MILLER, Judge.
Plaintiffs Molbert Brothers Poultry & Egg Company, Inc., and Jasper Feed Company, Inc. appeal the finding that Molbert Brothers had no cause of action against defendant Edgar W. Montgomery and that Jasper Feed's claim was one in redhibition and had prescribed. Defendant answered the appeal contending that damages should be awarded to Montgomery for the loss occasioned by Jasper Feed's refusal to purchase baby chicks which it had contracted to purchase.
Each party to this litigation had more than twenty years experience in the business of commercially raising or handling chickens. On March 2, 1966 Montgomery (as seller) contracted for the "sale of baby chicks" to Molbert Brothers (as buyer). Under the contract Montgomery was required to purchase 10,000 pullet chicks and 1,400 male chicks for the purpose of producing eggs from which "healthy and marketable baby chicks" can be hatched and sold to Molbert Brothers. Montgomery was obligated to sell all baby chicks hatched from eggs produced by the 10,000 hens and Molbert Brothers was obligated to purchase said chicks at a price of 8 cents each. Montgomery was obligated to deliver the chicks to Molbert Brothers in Jasper, Texas. The agreement provided that it "shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns." To establish the flock, Montgomery borrowed $25,000 under an interest free loan from Molbert Brothers. The loan was subsequently paid in full.
*313 On March 10, 1966 Molbert Brothers assigned the contract to its sister corporation Jasper Feed Company, Inc. Montgomery knew of and approved the transfer. As required by the contract, Montgomery purchased the pullets and male chicks. His flock matured and was inspected for pullorum by Louisiana authorities in September, 1966. The flock was approved as breeders.
Delivery of baby chicks started on October 28 and terminated on December 27, 1966 after some 233,000 chicks had been delivered and paid for.
Jasper Feed had some 35 to 50 separate "farmer" operators feeding out baby chicks for an eight to ten week period. At that time the chicks were expected to weigh more than three and one-half pounds and Jasper Feed would sell the chickens to Molbert Brothers in Lake Charles for slaughter.
Jasper Feed purchased chicks from three producers, one of which was Montgomery. Some of Jasper Feed's farmers raised only Montgomery chicks and some raised chicks from more than one producer. Only 40,000 chicks were delivered by Montgomery before November 15, 1966. Some 73,000 were delivered during the remainder of November. Sixty thousand were delivered before December 16 and 60,000 thereafter. More than the normal amount of Montgomery chicks began to die immediately after delivery. It became apparent that the Montgomery chicks were not developing properly and on December 9, 1966, some of the Montgomery chickens were sent to the Texas Agriculture Experiment Station Poultry Disease Investigations at Center, Texas. On December 15, 1966 a diagnosis was mailed to Jasper Feed stating that cultures from those chickens "were positive for pullorum disease."
Montgomery was contacted and the parties discussed the problem. On December 16, it was orally agreed that delivery would continue but that the price would be reduced to 7.6 cents per chick. Jasper Feed was to spend $.00.4 per chick for medication. As noted above, some 60,000 chicks were delivered between December 16 and December 27, all at a price of 7.6 cents each. Shortly after December 27, Jasper Feed was notified by Texas authorities that all their flocks would be quarantined if they purchased another chick from Montgomery without obtaining a current certificate from Louisiana authorities stating that Montgomery's flock was free from pullorum. Montgomery did not seek the certificate but sold his breeder flock for slaughter. We note defendant's argument that this sale was caused by Jasper Feed's refusal to take chicks and not to avoid testing the flock. There is no manifest error in the trial court's rejection of Montgomery's contention. The finding that Montgomery's chicks had pullorum when they were delivered is supported by the record. The finding that Montgomery did not know of this condition until December 16, 1966 is also supported by the record.
The trial court correctly found that Molbert Brothers had no cause of action against Montgomery. Under LSA-C.C. Art. 2642, the transfer of the contract rights from Molbert Brothers to Jasper Feed without reservation of rights, effectively terminated Montgomery's obligation to Molbert Brothers. Alternatively Molbert Brothers contends that the March 2, 1966 contract contained a stipulation pur autre vie in favor of Molbert Brothers, and that the concluding provision that the contract "shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns" gives rights to Molbert Brothers which exist after Molbert Brothers assigned the contract to Jasper Feed. The quoted provision of the contract does not provide additional rights to a third party and we distinguish the cases cited by Molbert Brothers on that ground. Molbert Brothers must look to its sister corporation Jasper Feed to recover its loss occasioned by its purchase of diseased chickens from Jasper Feed.
*314 The trial court correctly concluded that Jasper Feed's action is founded in redhibition. The contract was a contract for sale and was so nominated by the parties. Jasper Feed contends that Montgomery's chicks were infested with a disease called pullorum. It is contended that this disease rendered some of Montgomery's chickens unfit and worth less money and that many Montgomery chickens died. This is the classic redhibitory action. LSA-C.C. Arts. 2520, 2532. Sidney D. Fazio, "A Comparsion of Redhibition in Louisiana and the Uniform Commercial Code." 19 La.L.Rev. 165 at 166.
Actions based on a breach of warranty against defects are to be brought in redhibition instead of as a breach of contract. Unlike damages for other contractual breaches, damages caused by a breach of the warranty in a contract of sale are regarded as founded upon redhibition and subject instead to the prescription applicable to redhibitory actions. Crowley Grain Drier, Inc. v. Fontenot, 132 So.2d 573 at 577 (La.App. 3 Cir. 1961); Rapides Grocery Co. v. Clopton, 171 La. 632, 131 So. 734 (1930); Walton v. Katz & Besthoff, Inc., 77 So.2d 563 (La.App.Orls. 1955); Yeargain v. Blum, 144 So.2d 756 (La.App. 4 Cir. 1962); Minyard v. Curtis Products, Inc., 192 So.2d 208 (La.App. 4 Cir. 1966).
Jasper Feed argues that this is not a claim in redhibition because to be successful in a redhibitory action, one must tender the object of the sale to the seller. Womack v. Lafayette Furniture Co., 50 So.2d 843 (La.App. 1 Cir. 1951). This argument has been rejected where the article purchased is consumed by use and obviously cannot be returned. Walton v. Katz & Besthoff, Inc., 77 So.2d 563 (La. App.Orls.1955); Henderson v. Leona Rice Milling Company, 160 La. 597, 107 So. 259 (1926); and Rapides Grocery Company, Inc. v. Clopton, 171 La. 632, 131 So. 734 (1930). Under LSA-C.C. Art. 2532, it is not necessary to tender the chicks where they have "* * * perished through the badness of * * * quality * * *." See also LSA-C.C. Art. 2536. A return of the surviving diseased chickens was contraindicated by the nature of the transaction. It was established that seller could not have accepted return of the chicks. The rationale of the above cited cases is here applicable.
Jasper Feed next argues that the word animals as used in LSA-C.C. Art. 2535 does not include chickens and bases the argument on the definitions found in Webster's dictionary. We are more impressed with LSA-C.C. Art. 3419 wherein "chickens" are referred to as a species of animal.
"Art. 3419. Chickens, turkeys, geese, ducks and other domestic animals, shall not be considered wild animals, though there are species of these animals which exist in a state of natural liberty. * *" (Emphasis added.)
Jasper Feed knew that Montgomery's chicks had pullorum on December 16, 1966. The last purchase was made on December 27, 1966. Suit was not filed until May 15, 1967. Jasper Feed's claim for losses suffered by the chicks purchased from Montgomery had prescribed. LSA-C.C. Art. 2535.
Jasper Feed claims that part of its loss resulted from the spread of pullorum from Montgomery's chicks to chicks purchased from two other producers. Had plaintiff been able to show bad faith on the part of the seller, LSA-C.C. Art. 2545 would apply to this claim and 2546 would apply to its principal claim. However, plaintiff did not show bad faith on the part of defendant-seller. Seller's first knowledge of the pullorum infection in his flock came when plaintiff informed him on December 16, 1966. Prior to this time, defendant had reasonably relied upon his compliance with inspection requirements which had shown a negative reaction to pullorum in his flock. As to deliveries after *315 December 16, plaintiff, being well aware of the defect in defendant's chicks, cannot be allowed to recover in redhibition on either his principal or secondary demand.
Montgomery's reconventional demand was properly rejected. Jasper Feed was obligated to refuse delivery of chicks after December 27 when the Texas authorities gave notice that Jasper Feed's extensive operation would be quarantined if another Montgomery chick was delivered without a current certificate that Montgomery's flock was free of pullorum. Montgomery's failure to obtain the certificate terminated Jasper Feed's obligation under the contract.
The judgment of the trial court is affirmed. Costs of this appeal are assessed one-half to plaintiffs and one-half to defendant.
Affirmed.