603 So.2d 803 (1992)
MTU OF NORTH AMERICA, INC. and MTU Friedrichshafen
v.
RAVEN MARINE, INC., Transocean Marine, Inc. and Bernard A. Favret.
No. 90 CA 1702.
Court of Appeal of Louisiana, First Circuit.
July 16, 1992.
*804 Boris F. Navratil, Mangham, Hardy, Rolfs & Abadie, Baton Rouge, for plaintiffs/appellants.
John Haas Weinstein, Ltd., Opelousas, Raven Marine, Inc.
B.J. Rawls, Morgan City, for Transocean Marine, Inc.
Before WATKINS, CARTER, FOIL, GONZALES and WHIPPLE, JJ.
*805 WATKINS, Judge.
This is a suit by the manufacturer of marine diesel engines to recover the balance due on the purchase price of 20 engines; defendants filed a reconventional demand for redhibitory defect.
In 1982 suit was filed in the 16th Judicial District Court for the Parish of St. Mary by MTU Friedrichshafen (MTU-F), a German corporation with its principal place of business in Germany; and MTU of North America, Inc. (MTU-NA), a Delaware corporation with its principal place of business in the State of Texas (collectively MTU).[1] The suit named as defendants Bernard A. Favret, an individual domiciled in Morgan City, Louisiana; and Raven Marine, Inc. (Raven) and Transocean Marine, Inc. (Transocean), both Louisiana corporations with their principal place of business in Morgan City, Louisiana. The petition alleged that Mr. Favret was the president of Raven and that Transocean was owned and controlled by him.[2]
MTU's demand was for the balance of the purchase price of 20 marine diesel engines purchased on credit by Raven. MTU alleged that Mr. Favret, as president of Raven, had given several promissory notes for the purchase price of the engines, which amounted to $1,529,244.79 in globo, calculating principal and interest. The plaintiffs also claimed an additional balance of the purchase price owed of 1,630,837.44 DM (deutsch marks). Further demand was made for $167,282.00 for repair work on the diesel engines between October, 1979, and May, 1982.
Because Raven, serving as general contractor, had the engines placed in 10 crew/supply boats which were constructed by Swiftships, Inc., and because after construction of the vessels, Transocean took title to the vessels, the plaintiffs sued Mr. Favret, Raven, and Transocean. Plaintiffs prayed for a receiver to be appointed to liquidate Raven and Transocean and that they be enjoined from disposing of property. The plaintiffs sought judgment against Raven, Transocean, and Mr. Favret, in solido, dissolving the sales of the 20 engines, ordering the defendants to return the engines, and compelling the defendants to pay the difference in market value that had resulted from the use of the engines. In the alternative, plaintiffs sought a money judgment and recognition of their vendor's liens on the engines.
After having been sued by MTU, Mr. Favret filed for bankruptcy individually and for Transocean.[3]
Following a trial on the merits, the court rendered judgment in favor of MTU and against Raven for $1,529,244.79 and $815,418.50, the latter amount representing the court's conversion into dollars of the claim for deutsche marks.[4] The court also awarded MTU-NA judgment against Transocean for $27,934.20 for repairs.[5]
On the reconventional demand, the court found MTU liable to Transocean for the following: return of the purchase price, $1,580,972.00; interest on the loans financing the purchase price, $727,143.73; repairs, $507,112.28; and downtime (loss of profit), $169,166.00. Judgment was rendered *806 against MTU-F for the total, $2,984,393.90, plus $424,337.43 for attorney's fees.
MTU-F appealed,[6] and Transocean answered the appeal, seeking additional damages. Raven neither appealed nor answered the appeal.
In his articulate reasons for judgment, the trial judge explained the background of the instant litigation:
In the 1970's, as offshore activity increased and became profitable for many marine service companies, competition demanded improved and more efficient means of operation. One of the areas affected was the crew/supply boat industry.
Bernard Favret, by the late 1970's, had set up Raven Marine, Inc., Transocean Marine, Inc., and other corporations to engage in operations related to the offshore industry and more specifically to crewboat operations. Raven Marine's primary function was to act as contractor for the construction of vessels to be sold in the offshore industry. Transocean Marine owned and operated a fleet of vessels used as crew or crew/supply boats. Most of the engines powering TOM's[7] vessels were purchased from Raven Marine. Mr. Favret was the majority stockholder and chief executive officer of both Raven and TOM; however, at all times the two companies were separate and distinct corporate entities.
During the period MTU, which manufactured gas turbines, jet engines and diesel engines for marine application, began to attempt to market their engines in the offshore industry and especially to provide engines to the newer 120 to 125 foot crew/supply boats which were bigger, faster and had greater capacity. One of the ways that MTU obtained the names of prospective purchasers was through Swiftships, Inc., a vessel builder that did business with Favret. Favret was initially contacted in 1974 by MTU salesman Olaf Wadehn and Georg Hartmann who stressed the advantages of MTU engines in crew/supply boats such as: greater weight-to-power ratio, permitting greater loading and greater speed, along with "outstanding operating reliability and long operating life" (Plaintiff's Exhibit 22). After convincing owner's (sic) of Bruce Boat Rentals, Inc., Lobert and Paris Broussard of similar assertions, MTU sold the first MTU engines in crew/supply boats around 1975.
In November 1977, Raven Marine, through Favret, contracted with MTU-F to provide ten engines of MTU's 331 series. In early 1978, Raven entered into a contract with Swiftships to build five vessels to be powered by these engines. MTU partially financed the sale of the engines to Raven. In 1979, Raven contracted with Swiftships to build an additional six vessels to be powered by two MTU engines each. Raven, in its capacity as contractor, never ... operated any of the vessels involved in this litigation... but Raven did purchase all of the engines involved.... MTU-F designed, manufactured and sold all of these engines. MTU-NA, a wholly owned subsidiary of MTU-F, was and is in the business of distribution, marketing and maintenance of MTU-F products in the United States....
TOM alleges that the engines were not suitable for use in its crew/supply boat application, despite the assurances of MTU that they would provide outstanding operating reliability and long operating life. Mr. Favret contends that the engines failed to deliver the number of operating hours promised by MTU before major overhaul, and that repairs and overhauls were so much more costly than projected by MTU that with the additional problem of downtime, TOM was ruined financially. MTU contends however that TOM's problems were the result of abuse *807 and neglect and not defects in their equipment.
The original lawsuit was filed against Raven, TOM and Bernard Favret for failure to pay balance due on the engine sales. TOM reconvened claiming redhibitory defects in the engines.

Preliminary Dispositions
MTU's original suit against Raven, TOM and Favret arose out of Raven's default on the debt owed for the engines purchased from MTU. MTU attempted to recover from Favret by piercing the corporate veil. However, no evidence was presented indicating that this was warranted; therefore, the Court dismissed MTU-F's case against TOM and Favret.... By stipulation however (A-1), Raven owes $1,529,244.79 as balance due to MTU on six promissory notes. Raven also purchased ten engines for 2,693,860 Deutschmarks (sic) (DM). It paid MTU-F 1,063,023 DM leaving a balance due of 1,630,837 DM (Stipulation A-2). Using an exchange rate of 2:1, Raven owes a balance on this of $815,418.50. The Court finds Raven liable to MTU for $1,529,244.79 plus $815,418.50 for a total of $2,344,663.29.
MTU makes the threshold assertion that the trial court erred in applying state law instead of the federal law of admiralty to the issue of whether the absence of privity bars an action in redhibition by an ultimate buyer against the manufacturer. We find no merit to this argument. MTU relies on East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) for the proposition that absent privity, federal admiralty law does not allow suit for purely economic loss. However, the United States Supreme Court noted (476 U.S. at 872, n. 7, 106 S.Ct. at 2303, n. 7) that if the plaintiffs' claims had been in breach-of-warranty actions, they would not have been in the admiralty jurisdiction, but state law would have governed the actions. Consequently, the trial court correctly applied the Louisiana law of redhibition in the instant case.
MTU also urges that Louisiana's redhibition law is misapplied in this case because: (1) Transocean had no privity of contract with MTU; (2) the engines were component parts of an untried system; (3) the sale should have been viewed as 20 separate sales instead of in globo; and (4) as charterer, Transocean had no right of action for redhibition for two of the vessels.

REDHIBITION
A party who seeks recovery for a defective product has two options: he can sue for a rescission of the sale and the return of the purchase price, [LSA-C.C. art. 2531; Rey v. Cuccia, 298 So.2d 840 (La.1974) ] or he can sue for a reduction of the purchase price. LSA-C.C. art. 2541; Sanders v. Sanders Tractor Co., Inc., 480 So.2d 913 (La.App. 2d Cir.1985). Under either option he cannot recover damages and attorney's fees from a seller in good faith. However, a manufacturer is presumed to know the defects of the products it places in the chain of commerce. Thus, a manufacturer who is amenable to suit by a buyer has potential liability for damages and attorney's fees as well as for return of the purchase price or return of a portion of the purchase price representing a reduction in price. See Bourne v. Rein Chrysler-Plymouth, Inc., 463 So.2d 1356 (La.App. 1st Cir.1984), writ denied, 468 So.2d 570 (La.1985).
In 1972, the law of redhibition in Louisiana reached a turning point. In Media Production Consultants, Inc. v. Mercedes Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972), the buyer of a Mercedes automobile was allowed to recover, not only against his immediate vendor, but against the distributor who occupied the position of a manufacturer. The buyer was allowed to recover, on the basis of an implied warranty of fitness, the purchase price the buyer paid to his immediate vendor.
The court's concern for consumer protection was explicitly stated in Media Production, 262 So.2d at 381:
The equation of no privity, no liability is the traditional rule that held sway for *808 many years.... [H]owever, the privity requirement has been eliminated in product liability cases. (Citations omitted.)
Louisiana has aligned itself with the consumer-protection rule, by allowing a consumer without privity to recover, whether the suit be strictly in tort or upon implied warranty. (Citations omitted.)
We see no reason why the rule should not apply to the pecuniary loss resulting from the purchase of a new automobile that proves unfit for use because of latent defects.
The Legislature has declared that the distribution and sale of motor vehicles in Louisiana vitally affect the public interest. See LSA-R.S. 32:1251. By placing automobiles on the market, the supplier represents to the public that the vehicles are suitable for use. The intervention of a franchised dealer should not mitigate that responsibility. The dealer serves only as a conduit for marketing the automobiles.
The pecuniary loss resulting from an unusable vehicle is recoverable when there is an express warranty without privity. (Citations omitted.) Although there is a split of authority on the question, we find no adequate reason for not applying the same rule and allowing recovery when there is an implied warranty without privity. (Citations omitted.) (Emphasis in original.)
The no-privity-required rule was again applied shortly after Media in Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc., 315 So.2d 660 (La.1975). The court classified the ultimate buyer's claim against the manufacturer as arising from legal subrogation. Lake Charles Catholic High Schools, Inc. had entered into a contract with a general contractor for the construction of an addition to an existing school. The general contractor subcontracted with Moreno's, Inc. to furnish and install two air conditioning units. Moreno's bought the units from the manufacturer, Trane Company. When the units failed two and one half years after being installed, Moreno's installed replacements. But the school corporation, which was the ultimate buyer of the units, refused to pay for the replacements. When the school was sued, it brought suit against the manufacturer, Trane. The Louisiana Supreme Court allowed recovery against Trane, explaining:
This suit is the assertion of a claim by the school against the manufacturer based upon an implied warranty owed by the manufacturer by virtue of the sale to Moreno's, a right to which the school is subrogated by law. La.Civil Code art. 2503....
La.Civil Code art. 2531 provides that if a seller is liable because of redhibitory defects he has a corresponding and similar right of action against the manufacturer. The third-party plaintiff has a direct right of action against the manufacturer under the seller's accessory right of action, having proved that a vice existed in the manufacturing of the compressor.
Moreno's, Inc. v. Lake Charles Catholic High Schools, Inc., 315 So.2d at 663.
Accordingly, we find no merit to MTU's argument that Transocean's claim was barred for lack of privity. The trial court correctly applied the post-Media rule.
Nor do we find error in the trial court's factual conclusion that the engines were not component parts. The engines were just as separate and separable from the vessels as the air conditioning units were from the school in Moreno's. Consequently, we cannot disturb the trial court's factual determination. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
MTU's argument that the engines were 20 separate items for redhibition purposes is untenable when MTU, itself, treated the transactions between itself and Raven as two, not 20, in globo sales.
Finally, we reject MTU's argument that a charterer has no right of action. See East River SS Corp. v. Transamerica Delaval, Inc., supra, wherein the plaintiffs were charterers of supertankers.
At the trial level, as it does on appeal, MTU argued that neither Raven *809 nor Transocean was entitled to a rescission of the sale of the engines because return of the engines was impossible. We agree, and we hold that the trial court erred in rendering judgment for return of the purchase price.
A sale cannot be rescinded when the buyer who sues in redhibition no longer owns or possesses the defective product. If the plaintiff neither owns nor possesses the product when the suit for defect is tried, a total rescission of the sale is not possible, and the plaintiff is relegated to a reduction of the purchase price. See Bourne v. Rein Chrysler-Plymouth, Inc., supra, wherein the finance company had seized and sold the plaintiff's automobile before she filed suit against the seller and the manufacturer for redhibitory defects. Accord J.B. Beaird Co., Inc. v. Burris Bros. Ltd., 216 La. 655, 44 So.2d 693 (1949); Stratton-Baldwin Co., Inc. v. Brown, 343 So.2d 292 (La.App. 1st Cir.1977).
In the instant case ownership of the engines was transferred by Raven to Transocean. Transocean allowed the engines to be encumbered when Transocean entered into contracts to finance its purchase of the vessels from Swiftships and Raven.[8] Finally, *810 Transocean further affected title to the engines when Transocean went into bankruptcy. The case cited by Transocean, Associates Financial Services Co. v. Ryan, 382 So.2d 215 (La.App. 3d Cir. 1980), deals with tender prior to suit, not with return of the item at the time of rescission. Indeed, the court in Associates Financial affirmed the portion of the trial court judgment that ordered the truck involved to be returned to the seller. Whether or not the item was tendered to the manufacturer and/or seller prior to the filing of suit, the well established rule is that the buyer must be able to return the item in essentially its original condition and thus restore the vendor to the position he was in at the time of the sale in order to be entitled to rescission. Poor v. Hemenway, 221 La. 770, 60 So.2d 310 (1952).
In the instant case we believe the trial judge applied the wrong legal principles to the facts when he pointed out that rescission is not barred if return of the product is prevented by the nature of the product. See Greenburg v. Fourroux, 300 So.2d 641 (La.App. 3d Cir.), writ denied, 303 So.2d 181 (La.1974), (fact that puppy found to be suffering from neuromuscular disorder had to be euthanized did not bar rescission of sale). See also Molbert Bros. Poultry & Egg Co. v. Montgomery, 261 So.2d 311 (La.App. 3d Cir.) writ denied, 262 La. 306, 263 So.2d 46 (1972). Two other cases cited by the trial court question the plaintiff's right to a rescission of the sale when the product has been used. In Reech v. Coco, 223 La. 346, 65 So.2d 790 (1953), the use of a vehicle for 9,600 miles did not bar an action for rescission of sale. In Hebert v. Claude Y. Woolfolk Corp., 176 So.2d 814 (La.App. 3d Cir.1965), the use of a vehicle by the buyer while repairs were being attempted did not bar rescission when the defects proved unrepairable. Although Transocean used the MTU engines extensively, these cases are not controlling here. The acts of Transocean in putting itself into a position where it is impossible for it to return the engines bars a judgment rescinding the sale. See J.B. Beaird Co., Inc. v. Burris Bros. Ltd., supra.
Accordingly, we reverse that portion of the trial court's judgment awarding a return of the purchase price.
We now turn our attention to Transocean's entitlement to a reduction of the purchase price. The fact that a buyer is not entitled to rescission of a sale for redhibitory defect because he has disposed of the product does not foreclose the buyer from seeking a reduction of the purchase price. See Bourne v. Rein Chrysler-Plymouth, Inc. supra. We find no error in the trial court's factual conclusion that the MTU engines had a substantial redhibitory defect: they did not perform as the seller had warranted they would. Specifically, the engines were touted to operate for 12,000 hours without major overhaul, but they operated an average of only 3,000 hours. Cf. Peoples Furniture & Gift v. Carson Hicks/Friedrichs Refrigeration, Inc., 326 So.2d 919 (La.App. 3d Cir.), writ granted on other grounds, 329 So.2d 754 (La.1976).
The usual relief in quanti minoris cases is a reduction of the purchase price to the amount a reasonable buyer and seller, both aware of the defect, would have agreed upon. See Bourne v. Rein Chrysler-Plymouth, Inc., supra. Although there was testimony that the MTU engines cost two to three times more than comparable American-made engines, the price of the American-made engines is not germane to the reduced price for the MTU engines because of the warranties provided by MTU regarding performance and required maintenance. We believe the most accurate measure for a reduction in the purchase price in this case is a reduction of 75% to coincide with the fact that the engines performed only 25% of the promised time. When a defect sufficiently diminishes the value of a thing to warrant a reduction in the price ultimately paid by the ultimate buyer, the manufacturer must make up the difference between the actual value of the defective thing and the retail price.[9] See Media Production Consultants, *811 Inc. v. Mercedes Benz of North America, Inc., supra; Moreno's Inc. v. Lake Charles Catholic High Schools, Inc., supra, Dissent by Justice Marcus on other grounds. Our 25%/75% formula for a reduction of the purchase price paid to Raven by Transocean is consistent with the consumer-oriented rule of the Louisiana jurisprudence.
Additionally, a 75% reduction in price gives rise to an award of 75% of the finance charges as damages. See Peoples Furniture & Gift v. Carson Hicks/Friedrichs Refrigeration, Inc., supra. However, we cannot assign a dollar amount for either the purchase price or the interest until we address one of the errors assigned by Transocean in its answer to MTU's appeal.
We agree with Transocean that the trial court erred in denying recovery for the engines of the M/V Sea Condor and the M/V Sea Hawk. The trial court erroneously concluded that the clause in the ITT leases automatically terminated the lessee's rights in the event of default or bankruptcy by the lessee. Because the trial court found the automatic termination clause effective, the trial court ruled that Transocean's rights to recover in redhibition were terminated. Such a ruling was contrary to 11 U.S.C. Sec. 365(e)(1).[10] Accordingly, we will augment the judgment for the purchase price[11] and the interest by the following amounts: the Condor, $336,338.00 for price and $169,349.40 for interest; the Hawk $336,338.00 for price and $144,286.29 for interest. This brings the purchase price paid by Transocean to $2,253,648.00. MTU must reimburse Transocean 75% of this amount, or $1,690,236.00. This brings the interest paid by Transocean to $1,040,779.42; MTU must pay 75% of this amount, or $780,584.57. The total due Transocean for the purchase price and interest is $2,470,820.57.
Furthermore, the trial court's awards for repairs and downtime are inconsistent with our action in awarding a reduction in the purchase price in lieu of rescission *812 of the sale, and we vacate them. The cost of repairs is an expense for the preservation of the product. See Breaux v. Winnebago Industries, Inc., 282 So.2d 763 (La. App. 1 Cir.1973). In a suit for the rescission of the sale, the buyer is awarded costs of repairs because the preserved product is returned to the manufacturer. But in a suit for reduction of the purchase price, the product remains with the buyer. The cost of preserving the product is for the buyer's own benefit; it is not reimbursable. We conclude that Transocean is not entitled to an award for repairs. Nor is Transocean entitled to an award for downtime. Under the facts of this case the substantial reduction of the purchase price makes the buyer whole. An award for downtime on top of our award for the percentage of time the engines did not function would result in a double recovery for Transocean, particularly in light of the substantial use Transocean made of the engines.
Finally, we find no merit in MTU's argument that it is entitled to set off the portion of the purchase price still owed by Raven against the amount it owes to Transocean. A set off would be appropriate only if Transocean were liable itself for all or a part of the purchase price, or if Transocean were liable for Raven's obligation; neither liability exists here. The trial court correctly noted that MTU failed to prove that the circumstances of the case require piercing the corporate veil; the trial court found that Raven and Transocean were "separate and distinct corporate entities." Because there is ample support in the record for this finding, we cannot disturb the trial court's ruling. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Nor can we consider the trial court's action in dismissing Mr. Favret and Transocean from MTU's suit for the unpaid purchase price; MTU did not preserve for appeal an objection to that dismissal. Furthermore, MTU's demand against Raven has now been reduced to judgment, and Raven did not appeal. Thus, the question of liability of any of the defendants for the purchase price is not before us on appeal. The only aspect of MTU's original suit for the purchase price which we can consider is the amount of the judgment as affected by the conversion from deutsche marks into dollars.
MTU urges on appeal that it was error for the trial court to convert the deutsche marks into dollars. We agree. The contract was perfected in the foreign currency, and judgment should be awarded in that currency. Accordingly, we will amend the judgment in favor of MTU-F and against Raven to award $1,529,244.79 plus 1,630,837.44 DM.

ATTORNEY'S FEES AND OTHER EXPENSES
Finally, we review the award for attorney's fees and other expenses of Transocean. We find no error in the trial court's decision that Transocean was entitled to an award for this item, nor in the amounts calculated by the trial court. Accordingly, we quote and adopt as our own the pertinent portion of the trial court's reasons for judgment, as follows:
Article 2545 of the Louisiana Civil Code provides that the seller with actual knowledge of a defect or constructive knowledge as in the case of a manufacturer, is also liable for repayment of expenses associated with the sale, including reasonable attorney's fees. In this case, not only was MTU the manufacturer of the engines in question, but it has also been clearly shown that MTU had knowledge of the requirements of the crew supply boat operation and the inability of their engines to meet these requirements, rendering their knowledge of defects in quality.... Therefore, an award of attorney's fees and expenses is entirely appropriate in this case.
The courts have developed a number of factors to be considered in the determination of reasonable attorney's fees. These factors include:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly;
(2) the likelihood that acceptance of the particular employment would preclude other employment by the lawyer;

*813 (3) the customary fees;
(4) whether the fee is fixed or contingent;
(5) the time limitations imposed by the client or the circumstances;
(6) the amount involved and the results obtained;
(7) the experience, reputation and ability of the lawyer or lawyers performing the service.
City of Baton Rouge vs, Stauffer Chemical, 500 So.2d 397 (La.1987).
This case involved complex issues of a highly technical nature. To add to the degree of difficulty, MTU was a German based corporation, and many of the persons with knowledge necessary for this litigation could only speak German. Hundreds of documents, relevant to the case, had to be evaluated. Many of these documents were not only extremely technical but were printed in German and had to be translated. Numerous problems in discovery also occurred during the course of the litigation; some requiring the Louisiana Supreme Court to resolve. See MTU of N.A. vs. Raven Marine, 475 So.2d 1063 (La.1985). It was also necessary for the attorneys to travel to Germany to aid in the resolution of the discovery problems. This lawsuit was filed in 1983. It is clear that much of the attorneys' practice since that time has been devoted to this case. The record reflects that the trial on the merits lasted over ten days. Mr. Weinstein and Mr. Rawls have introduced into evidence their itemized list of their time and expenses of litigation. Plaintiff's Exhibit 123 reflects that both attorneys together expensed two thousand hours relating to this case. The Court finds that in light of the above enumerated factors this number of hours at a rate of $150.00 per hour is reasonable compensation, amounting to $300,000.00. In addition to attorney's fees, Plaintiff's Exhibit No. 123 also reflects other expenses associated with the trial of this case. Because of the complexity of the matter, experts had to be brought in to both interpret and comment on the technical aspects. This resulted in significant expert fees, numerous depositions, and also frequent travel. The itemized list of expenses is hereby found to be appropriate and the Court awards $123,337.43. Therefore, the Court awards to attorneys Weinstein and Rawls $424,337.43 for attorneys' fees and expenses of litigation.
Accordingly, the judgment of the district court rendered on May 18, 1990, is affirmed except for the following amendments to paragraph two and paragraph four of the judgment, which shall read as follows:
IT IS ORDERED, ADJUDGED AND DECREED, that there be Judgment herein in favor of MTU OF NORTH AMERICA, INC., and MTU FRIEDRICHSHAFEN and against RAVEN MARINE INC., in the amount of ONE MILLION FIVE HUNDRED TWENTY-NINE THOUSAND TWO HUNDRED FORTY-FOUR AND 79/100 ($1,529,244.79) DOLLARS, plus 1,630,837.44 DM (deutsche marks), with legal interest from date of judicial demand until paid.
IT IS FURTHER ORDERED ADJUDGED AND DECREED, that there be Judgment herein in favor of TRANSOCEAN MARINE, INC., and against MTU OF NORTH AMERICA, INC., and MTU FRIEDRICHSHAFEN in the amount of TWO MILLION FOUR HUNDRED SEVENTY THOUSAND EIGHT HUNDRED TWENTY AND 57/100 ($2,470,820.57) DOLLARS, with legal interest from date of judicial demand until paid.
MTU OF NORTH AMERICA, INC. and MTU FRIEDRICHSHAFEN are cast for costs of this appeal.
AMENDED, AND AS AMENDED, AFFIRMED.
CARTER, J., concurs in part and dissents in part for reasons assigned.
FOIL, J., concurs in part and dissents in part for reasons assigned by CARTER, J.
CARTER, Judge, concurring in part and dissenting in part.
I respectfully dissent from the majority opinion insofar as its calculation of the *814 amount by which the purchase price should be reduced and insofar as it denied MTU a set-off against the trial court award of $27,934.20 for repairs. In all other respects, I concur with the result reached by the majority.
With regard to the proper amount of price reduction to which a purchaser is entitled in an action in quanti minoris, the law is clear that the reduced price is the difference between the actual selling price and the price a reasonable buyer and seller would have agreed upon if they had both known of the defects. Cornelious v. Bailey Lincoln-Mercury, Inc., 566 So.2d 85, 89 (La.App. 4th Cir.1990); Harper v. Coleman Chrysler-Plymouth-Dodge, Inc., 510 So.2d 1366, 1369 (La.App. 3rd Cir.1987); Bourne v. Rein Chrysler-Plymouth, Inc., 463 So.2d 1356, 1359 (La.App. 1st Cir.1984); Lusk v. Durham Pontiac-Cadillac, Inc., 459 So.2d 1277, 1280 (La.App. 1st Cir.1984). One of the principal elements in formulating the award is the cost of repairing the defects which existed at the time of the sale. Besse v. Blossman, 521 So.2d 570, 573 (La.App. 1st Cir.1988); Lusk v. Durham Pontiac-Cadillac, Inc., 459 So.2d at 1281. The buyer also has the right to be compensated for uncured defects, curtailments of use, and the inconvenience caused by the defects. Cornelious v. Bailey Lincoln-Mercury, Inc., 566 So.2d at 89; Lusk v. Durham Pontiac-Cadillac, Inc., 459 So.2d at 1281.
In determining the selling price which a reasonable buyer and seller would have agreed upon knowing of the defects in the engines, the various items of damages established at trial, which include repair costs and downtime, should have been considered.
REPAIR COSTS.
In his written reasons for judgment, the trial judge discussed the various repair costs Transocean incurred. The repair histories of each of the engines were stipulated in Stipulations Nos. B.3.9 to B.3.35. Additionally, plaintiff's Exhibit No. 43 summarized the costs of repairs. The trial judge required MTU to refute any of the charges on the repair summary which were erroneous. The testimony at trial revealed several inaccuracies and duplications in the repair summary. The trial judge determined that the corrected repair summary, which was included in Transocean's post-trial brief accurately reflected the repair costs. This summary showed total repair costs of $605,378.07. Because of his finding that the ITT leases automatically terminated upon the bankruptcy of the lessee, the trial judge then deducted from the total repair costs those repair costs attributable to the Sea Condor and the Sea Hawk, $37,047.24 and $61,218.55 respectively. Accordingly, he awarded Transocean $507,112.28 in repairs. Because of the determination that the trial court erred in denying Transocean recovery for the Sea Condor and the Sea Hawk, the repair costs of the engines for both of these vessels, in addition to the repair costs for the repairs to the engines for the other vessels or $605,378.07, should be included in the calculation of the purchase price.
LOSS OF PROFITS OR DOWNTIME.
In his written reasons for judgment, the trial judge set forth the downtime requested by Transocean. The trial judge noted that some of the downtime resulted from engine failure and some of the downtime reflected periods of time when the vessels were out of work. The trial judge determined that a significant amount of the downtime resulted from the vessels being idle for lack of work. In his written reasons for judgment, the trial judge explained:
Transocean Marine contends that, by this time, MTU's poor reputation resulted in their difficulty in renting MTU powered vessels. At trial, there was some testimony pointing to the bad reputation of MTU. Mr. Lobert Broussard indicated that several jobs were lost because of downtime associated with his MTU powered vessels. (TR p. 39/ TR p. 173). However, the argument was not convincing that TOM itself lost specific jobs due to the poor reputation of MTU's engines. There were no customers of TOM who testified indicating that they had specifically refused to hire TOM's boats because *815 of the existence of the MTU engines on board. In fact, Mr. Favret testified at trial that no one told him that they didn't want to hire vessels with MTU engines. Instead, when he solicited business his customers would typically say "no work is available ..." Mr. Favret stated that he thought that the problem was the MTU engines because later he discovered that some vessels were replacing their MTU engines with GM engines. (TR p. 1497).
Dr. James A. Richardson, professor of Economics at LSU, by way of deposition confirmed what TOM's customers were indicating; that offshore oil exploration had peaked and was taking a dramatic downturn at this time. Dr. Richardson indicated that the price of oil peaked in 1981 at $32 a barrel but by 1986 it had dropped to about $12 a barrel. In 1977 there were 144 rigs operating in the Gulf. This increased to 206 in 1980, but then fell to 154 in 1981, reaching 129 by 1985. (Richardson Deposition p. 31-35). Dr. Richardson also indicated that incorrect economic forecasts projecting increases in the price of oil lulled people in the industry into believing that there would be a high demand for marine transportation. In 1981 there were 367 crew boats available for 154 wells being drilled. By 1985 there were 508 crew boats for 129 wells being drilled. (MTU Exh. # 85). It is clear to the Court that this contributed greatly to the slowdown in the crew/supply boat industry and obviously was a contributing factor to what Transocean Marine refers to as downtime.
In light of the lack of convincing evidence of specific instances of lost business due to reputation of MTU engines, the trial judge permitted recovery only for downtime directly attributable to engine failure.
With regard to the Sea Ravener, the summary of downtime revealed that the vessel was out of service for 516 days between March 19, 1979 and March 15, 1984.[1] Stipulation B.3.1 showed that this vessel was operated by Transocean until September 27, 1982. The repair histories of the Sea Ravener, which are contained in Stipulations B.3.9 through 3.15, do not reveal that the engines for this vessel were repaired or placed back in service after September 27, 1982. Therefore, the trial judge determined that the 472 days of downtime commencing December 29, 1982 were not compensable.
The summary of downtime for the Sea Eagle, which was introduced as Plaintiff's Exhibit # 46, showed that the vessel was out of service 123 days between May 25, 1983 and September 24, 1983.[2] Stipulations *816 B.3.16 through 3.22, which represent the repair history of the Sea Eagle, do not indicate that any major engine repairs were made after March 4, 1983. The trial judge determined that there were no major engine repairs between May 25, 1983 and September 24, 1983 and that, as a result, the 123 days of downtime during this period were not compensable. However, the same is also true for the downtime allegedly incurred between November 5 and November 29, 1983. Accordingly, the alleged downtime during this period is likewise not compensable.
Stipulation B.3.3 showed that the Sea Falcon was placed in service on May 5, 1979 and was operated until April 25, 1983. Therefore, the trial judge refused to permit compensation for the alleged downtime between April 26, 1983 and October 11, 1983.[3] Moreover, Stipulations B.3.23 through 3.25, which reflect the repair summaries for the Sea Falcon, revealed that no major engine repairs were performed after September 5, 1982.
With regard to the Sea Macaw, Stipulation B.3.4 revealed that the vessel was placed in service on August 22, 1981 and was operated by Transocean until February 29, 1984. Again, the trial judge determined that the 467 days of alleged downtime from March 1, 1984 to June 11, 1985, which was set forth in Plaintiff's Exhibit # 52, were not compensable. The repair summaries for the Sea Macaw, which are contained in Stipulations B.3.31 and 3.32, also showed that no major engine repairs were performed after February 9, 1984.
Stipulation B.3.7 revealed that the Sea Condor was placed in service on February 13, 1980 and was operated by Transocean until January 9, 1983, when it was repowered with an American-made engine. Although Transocean alleged that the Sea Condor sustained 502 days of downtime between October 17, 1982 and March 2, 1984,[4] the repair summaries, which are contained *817 in Stipulation B.3.34 and 3.35, reveal that the vessel did not undergo any major engine repairs after January 9, 1983. As such, only 85 of the 502 days alleged could possibly be attributed to engine failure.
The Sea Hawk was operated by Transocean from May 6, 1980 until June 27, 1983, according to Stipulation B.3.6. Thereafter, it was repowered with a non-MTU engine. This vessel was allegedly down because of engine failure 378 days between September 21, 1981 and July 30, 1984.[5] However, the 333 days of downtime allegedly sustained by Transocean after the date that the vessel was repowered with a non-MTU engine is not compensable as related to MTU engine failure. Moreover, the repair summaries, which are contained in Stipulation B.3.26 through 3.28, show that although one of the engines from the Sea Hawk was repowered with a non-MTU engine on or about June 27, 1983, Transocean claims to have rebuilt the engine and repaired four cylinder heads during September and October of 1983. Other than this apparently erroneous notation in the repair summaries, no other major engine repairs were performed on the Sea Hawk after January, 1983.
With regard to the Sea Gladiator, Stipulation B.3.7 reveals that Transocean operated this vessel between October 3, 1980 and March 18, 1987. During this period of time, the Sea Gladiator was allegedly down for 221 days due to engine failure.[6] The repair summaries, which are contained in Stipulations B.3.29 and B.3.30, reveal that no major engine repairs were performed on this vessel after September, 1984. Therefore, the trial judge disallowed 180 days of downtime as not resulting from engine failure.
After discounting the downtime that was clearly not the result of the failure of the MTU engines and considering all of the potential downtime allegedly due to failure of the MTU engines, the trial judge determined that the evidence failed to establish that all of downtime claimed by Transocean was attributable to engine failure. The trial judge noted in his written reasons for judgment that:
During cross-examination of Mr. Favret at trial, MTU explored the downtime listed above for the Sea Ravener. It was shown, for example, that the downtime for the Ravener in June of `80 listed as 16 days was not all downtime due to repair the engine. Mr. Favret described this item as follows: "On June 1 the damage occurred ... it was completed... on June 3rd, and from that period of time when the engine was installed, it waited for a job ..." (TR p. 1489). This indicates that the vessel was out three days for repair whereas sixteen days were claimed in downtime. Thirteen days of the claimed downtime was due to the fact that the vessel was sitting idle awaiting a job, which this Court has decided is not compensable in this case. The record also reflects that the repairs in March to the Ravener began on the *818 17th, were completed on the 18th, with sea trials on the 24th. Downtime was claimed however until April 6. (TR p. 1502). It is likely that each item of downtime listed in the table consists of downtime associated with actual repair plus idle time where boats were awaiting jobs. The evidence does not clearly distinguish between the two. Counsel for MTU indicated at trial that they would point out in brief any distinctions and indicate any discrepancies in Transocean Marine's downtime summaries. MTU failed to do so.
... Looking at all the facts, including the testimony of Mr. Favret, the Court finds that it would be reasonable and appropriate to award 1/3 of the remaining 350 days of actual downtime as representative of actual downtime associated with engine failure. The Court takes notice of the practicalities involved in crew boat operations and finds that variable operating expenses when a vessel is down continue for thirty days. In other words, the crew operator keeps his crew and operation in tact for at least thirty days. Therefore, actual downtime lost during that first thirty days would be the loss of the rental charge for the vessel. It is indicated that $1,450.00 per day is a reasonable rental fee. (Plaintiff's Exhibit 119).
Thereafter, the trial court awarded Transocean $1,450.00 per day for one-third of the 350 days attributed to downtime. Following this rationale, the total downtime for all of the vessels, including the downtime of the Sea Condor and the Sea Hawk, was 494 days. One-third of this number or 165 days at the daily rental rate or $239,250.00 should be included in the calculation of the purchase price a buyer and seller aware of the defects in the engines would have agreed upon.
Therefore, considering all of the evidence, I submit that the purchase price paid by Transocean should be reduced by a figure which reflects the $605,378.07 in repair costs, the $239,250.00 in downtime, and other incidental costs of the sale established at trial as opposed to the 25%/75% formula for reduction as set forth by the majority.
Additionally, I submit that MTU should be permitted to set-off its award of $27,934.20 for the cost of repairs against the judgment awarded against it for the reduction in purchase price.
NOTES
[1] In 1979 MTU-NA purchased Gulf Propulsion, Inc., which was located in Morgan City, Louisiana, and which had been an authorized dealer for MTU marine diesel engines since 1975.
[2] The trial court found that Mr. Favret was CEO and majority stockholder of both corporations.
[3] In their answer and reconventional demand, Raven, Transocean, and Mr. Favret refer to themselves collectively as "TOM." They allege, inter alia, that TOM purchased the engines from MTU. Throughout their pleadings, the defendants-plaintiffs in reconvention do not differentiate between the two corporations and the individual.
[4] The conversion into dollars is one of the errors assigned by MTU on appeal. We will address this issue hereinafter.
[5] The trial judge stated in written reasons for judgment: "In Stipulation A-3, MTU claims that TOM owes $167,280.00 in repairs. In the same stipulation, TOM claims that only $27,934.20 is owed. MTU presented no proof of its claim; therefore, the Court accepts TOM's confession as true and correct and awards $27,934.20 to MTU (NA) for repairs...." This portion of the judgment has not been appealed.
[6] The case previously was before us and the Louisiana Supreme Court on issues which arose during discovery. See MTU of North America, Inc. v. Raven Marine, Inc., 475 So.2d 1063 (La. 1985) and MTU of North American, Inc. v. Raven Marine, Inc., 499 So.2d 289 (La.App. 1st Cir. 1987).
[7] It appears that the trial judge's references to "TOM" were to Transocean only.
[8] Ownership of the vessels changed hands as set forth in the following stipulation which was filed into the record:

1.
The M/V SEA RAVENER was built by Swiftships, Inc. of Morgan City, La., under a contract with Raven Marine, Inc. for $563,909. This price did not include the main propulsion engines and some other gear, supplied by Raven Marine, Inc. Transocean Marine purchased this vessel on February 2, 1979, and financed the acquisition in whole or part by borrowing $735,000 from Louisiana National Leasing Corporation. From the proceeds of this loan it paid $563,909 to Swiftships and the balance to Raven Marine.
2.
The M/V SEA EAGLE was built by Swiftships, Inc. of Morgan City, La., under a contract with Raven Marine, Inc. for $570,251. This price did not include the main propulsion engines and some other gear, supplied by Raven Marine, Inc. Transocean Marine purchased this vessel on August 8, 1979, and financed the acquisition in whole or in part by borrowing $850,000 from IFT Incorporated. From the proceeds of this loan, it paid $570,251 to Swiftships and the balance to Raven Marine.
3.
The M/V SEA FALCON was built by Swiftships, Inc. of Morgan City, La., under a contract with Raven Marine, Inc. for $565,134. This price did not include the main propulsion engines and some other gear, supplied by Raven Marine, Inc. Transocean Marine, Inc. purchased this vessel on June 14, 1979 and financed the acquisition in whole or in part, by borrowing $802,600 from Westinghouse Credit Corporation. From the proceeds of this loan, it paid $565,134 to Swiftships and the balance to Raven Marine.
4.
The M/V SEA MACAW was built for (sic) Swiftships, Inc. of Morgan City, La. under a contract with Raven Marine, Inc., for $902,166. This price did not include the main propulsion engines and some other gear, supplies (sic) by Raven Marine, Inc. Transocean Marine purchased this vessel on August 26, 1981, and financed the acquisition in whole or in part, by borrowing $1,000,000 from Seafirst Corporation. From the proceeds of this loan it paid $902,166 to Swiftships and the balance to Raven Marine.
5.
The M/V SEA CONDOR was built by Swiftships, Inc. of Morgan City, La., under a contract with Raven Marine, Inc. for $567,563. This price did not include the main propulsion engines and some other gear, supplied by Raven Marine, Inc. ITT Industrial Credit Co. of Iowa purchased this vessel on May 2, 1989, for $1,246,300, pursuant to transactions more fully described in Stipulation No. B.2.3. From the proceeds of this sale $567,563 was paid to Swiftships and the balance to Raven Marine.
6.
The M/V SEA HAWK was built for (sic) Swiftships, Inc. of Morgan City, La., under a contract with Raven Marine, Inc. for $569,725. This price did not include the main propulsion engines and some other gear, supplied by Raven Marine, Inc. ITT Industrial Credit Co. of Iowa purchased this vessel on July 8, 1983, for $1,353,000, pursuant to transactions more fully described in Stipulation No. B.2.2. From the proceeds of this sale, Transocean Marine paid Swiftships $569,725 and the balance to Raven Marine.
7.
The M/V SEA GLADIATOR was built by Swiftships Inc. of Morgan City, La., under a contract with Raven Marine, Inc., for $882,482. This price did not include the main propulsion engines and some other gear, supplied by Raven Marine, Inc. Railway Equipment Leasing Co. purchased this vessel on October 15, 1980, for $1,430,000, pursuant to transactions more fully described in Stipulation No. B.2.4., and financed the entire purchase price through Greyhound Leasing and Financing Corporation, giving it a Preferred Ship's mortgage on the vessel. The vessel was thereafter chartered to Transocean Marine.
[9] In the "usual" scenario, such as that presented in Media, the successful ultimate buyer is given judgment against the dealer and the manufacturer, in solido. The conceptual problem with the retail price was discussed at 49 Tul.L.Rev. 376, 385 (1975). The commentator noted that when the vendors in the chain of purchase are cast solidarily, the sub-vendee can proceed against any of the prior vendors who are solidarily liable with him, leaving the issue of profits to be settled among the co-debtors according to the facts.
[10] The provision reads:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on
(A) the insolvency or financial condition of the debtor at any time before the closing of the case;
(B) the commencement of a case under this title; or
(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.
[11] On appeal the parties have not disputed the figures used by the trial court for the purchase price of the engines by Transocean, as follows:

Engine Number Vessel Name Purchase price
 (2 engines)
553-192 M/V Sea Ravener $250,000
553-193
553-359 M/V Sea Falcon $300,000
553-360
553-361 M/V Sea Eagle $300,000
553-362
558-519 M/V Sea Macaw $365,486
558-520
558-521 M/V Sea Gladiator $365,486
558-522
553-363 M/V Sea Condor $336,338
553-364
553-365 M/V Sea Hawk $336,338
553-366

[1] The downtime summary for the Sea Ravener, which was introduced into evidence as Plaintiff's Exhibit # 44, reveals the following:

March 19, 1979 to March 23, 1979 5
June 1, 1980 to June 16, 1980 16
March 18, 1982 to April 6, 1982 20
July 4, 1982 to July 7, 1982 3
December 29, 1982 to March 15, 1984 472

[2] The downtime summary for the Sea Eagle, which was introduced into evidence as Plaintiff's Exhibit #46, reveals the following:

October 20, 1979 to October 21, 1979 2
July 11, 1980 to July 11, 1980 1
July 25, 1980 to August 2, 1980 9
January 6, 1982 to January 8, 1982 3
April 9, 1982 to April 12, 1982 4
March 4, 1983 to March 15, 1983 12
May 25, 1983 to September 24, 1983 123
November 5, 1983 to November 29, 1983 25

[3] The downtime summary of this vessel, which was introduced into evidence as Plaintiff's Exhibit # 45-A, reveals the following:

September 19, 1980 to September 22, 1980 4
October 3, 1980 to October 17, 1980 15
October 25, 1980 to October 28, 1980 4
June 19, 1981 to June 23, 1981 5
April 18, 1982 to September 17, 1982 153
December 1, 1982 to December 10, 1982 10
February 14, 1983 to February 28, 1983 15
March 1, 1983 to March 3, 1983 3
March 17, 1983 to March 26, 1983 10
April 26, 1983 to October 11, 1983 168

[4] The downtime summary of this vessel, which was introduced into evidence as Plaintiff's Exhibit # 50, reveals the following:

March 5, 1981 to March 27, 1981 22
November 20, 1981 to November 27, 1981 7
January 12, 1982 to January 20, 1982 9
March 4, 1982 to March 4, 1982 1
October 17, 1982 to March 2, 1984 502

[5] The downtime summary of this vessel, which was introduced into evidence as Plaintiff's Exhibit # 47, reveals the following:

September 21, 1981 to September 29, 1981 11
June 16, 1982 to June 20, 1982 5
July 27, 1982 to July 31, 1982 5
January 23, 1983 to February 15, 1983 24
July 14, 1983 to October 7, 1983 85
November 25, 1983 to July 30, 1984 248

[6] The downtime summary of this vessel, which was introduced into evidence as Plaintiff's Exhibit # 51, reveals the following:

September 8, 1984 to October 13, 1984 31
August 13, 1985 to February 8, 1986 180